UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO: 1:22-cv-00611-WO-JLW

| | | |
|---|---|---|
| COMMON CAUSE, ELIZABETH MARION SMITH, SETH EFFRON, JAMES M. HORTON, TYLER C. DAYE, and SABRA J. FAIRES, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | MEMORANDUM IN SUPPORT |
| v. | ) ) | OF MOTION TO DISMISS |
| TIMOTHY K. MOORE, Speaker, North Carolina House of Representatives; and PHILLIP E. BERGER, President Pro Tempore, North Carolina Senate, | ) ) ) ) ) ) | |
| Defendants. | ) | |

<u>NATURE OF THE MATTER</u>

Plaintiffs are registered unaffiliated voters in North Carolina backed by Common Cause. Together Plaintiffs argue that the current makeup of party-affiliated voters on the North Carolina State Board of Elections is unconstitutional. Section 163-19 of the North Carolina General Statutes notes that no more than three members of the Board shall be from the same political party and that the Governor will pick the five members from lists prepared by the party chair of each of the two political parties having the highest number of registered affiliates. "Each party chair shall submit a list of four nominees who are affiliated with that political party." N.C. Gen. Stat.

1

§ 163-19(b). Plaintiffs argue that by not allowing unaffiliated voters to serve on the State Board, their First Amendment and Equal Protection rights are violated.

However, these Plaintiffs lack standing to bring those claims. And Defendants, members of the legislative branch, who enact but do not enforce laws are immune from suit for such claims in federal court. Even if Plaintiffs could overcome these issues, the federal constitution does not support such associational claims, and, these claims run headlong into the North Carolina Constitution, which has been interpreted by North Carolina courts to require that the Governor be able to control the State Board of Elections. Counterbalancing one major party's views and priorities on the State Board with that of the other major party's views, therefore, is a rational approach to election administration adopted by numerous other states.

This Court should grant Defendants' motion to dismiss.

<u>STATEMENT OF FACTS</u>

Each Plaintiff, aside from Common Cause, asserts that he or she is currently registered with the Board of Elections as an unaffiliated voter. (Doc #11, ¶ 3). Plaintiffs Smith and Faires believe that neither current major political party is consistent with their own views. (*Id.* ¶¶ 4, 12). Plaintiffs Effron and Horton enjoy voting in either Democratic or Republican primaries as the circumstances suit them, (*id.* ¶¶ 7, 9), a popular reason for registering

unaffiliated that is available to only unaffiliated voters, *see* N.C. Gen. Stat. § 163-119. Plaintiff Daye simply does not like political parties and sees them as a problem. (Doc #11, ¶ 10). Plaintiffs do not allege that they are all members of Common Cause or that they have anything in common with each other beyond their apparent desire to be on the Board of Elections.

Defendants, sued in their official capacities as Speaker of the North Carolina House of Representatives and President Pro Tempore of the North Carolina Senate, are the only named defendants in the case. (Doc #11, ¶¶ 14, 15). Plaintiffs admit that Defendants are members of North Carolina's legislative branch. Plaintiffs have named no individuals in any capacity as defendants associated with enforcing the laws of the State.

Plaintiffs' allegations focus on the duties of the State Board and how many unaffiliated voters exist in North Carolina. They allude to only once when an unaffiliated person served on the board. (Doc #11, ¶ 36). But Plaintiffs do not elaborate as to why that otherwise unbroken century of service by party-affiliated members was as brief as it was.

Session Law 2018-2, Part VIII did alter the makeup the board governing elections and ethics enforcement, but it was a change essentially undoing the General Assembly's attempts to create a bipartisan elections and ethics board. Session Law 2017-6 created a board evenly split between the two major parties. *See Cooper v. Berger*, 370 N.C. 392, 395, 809 S.E.2d 98,

100 (2018). Governor Cooper sued, arguing that his obligation to faithfully execute the laws required that he have more influence and control over the board than an evenly, politically split board would provide. Relying on the North Carolina Supreme Court's decision in *Cooper*, 370 N.C. at 415, 809 S.E.2d at 112, which adopted the Governor's interpretations, the General Assembly found in Session Law 2018-2 that "appointment of a State Board member who is not affiliated with the two largest political parties will foster nonpartisan decision-making by the State Board." 2018 N.C. Sess. Law 2 § 8(a). The proposal to add one member to the Board who was not a registered affiliate of either of the two largest political parties was enacted on 16 March 2018. *Id.* §§ 8(b) and 9.

The Governor then sued again, arguing that the 4-4-1 political makeup of the Board also violated the separation of powers doctrine in our state Constitution by preventing him, as chief executive, from controlling the views and priorities of the State Board. (*See* Exhibit A, Order in 18 CVS 03348). A three-judge superior court panel agreed, and the trial court enjoined Part VIII of Session Law 2018-2. (*See id.*) Following this decision, the General Assembly returned the administrative structure of elections, ethics, and lobbying to the 2016 structure, which included the reestablishment of N.C. Gen. Stat. § 163-19. *See* 2018 N.C. Session Law 146 §§ 3.1 and 3.2.

4

<u>QUESTION PRESENTED</u>

1. Whether Defendants' motion to dismiss for lack of standing should be granted when Plaintiffs lack the requisite representative standing to represent unaffiliated voters and service on the State Board involves the independent judgment of third parties.

2. Whether Defendants' motion to dismiss should be granted because Defendants, as legislators sued in their official capacities, are entitled to Eleventh Amendment immunity.

3. Whether Defendants' motion to dismiss should be granted because there is no First Amendment right to serve in a policymaking election administration role, and requiring party affiliation in such a role is rationally related to legitimate government interest, thereby negating an equal protection challenge.

<u>ARGUMENT</u>

I. Plaintiffs lack the requisite representative standing to represent unaffiliated voters and service on the State Board involves the independent judgment of third parties.

Defendants challenge Plaintiffs' standing to bring the claims they do and, therefore, whether this Court has subject matter jurisdiction. When analyzing a complaint on a motion to dismiss for lack of subject matter jurisdiction, "the court will read the Complaint as a whole and will construe it broadly and liberally." *Flue-Cured Tobacco Co-op. Stabilization Corp. v. U.S. E.P.A.*, 857 F. Supp. 1137, 1140 (M.D.N.C. 1994). "Unlike a 12(b)(6) review, however, the court will not draw argumentative inferences in favor of Plaintiffs." *Id.* "Finally, the court will consider all uncontroverted factual

allegations to be true, but will not accept unsupported conclusions of law." *Id*.

To show an appropriate case or controversy a litigate must "prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020). "[A] grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an injury in fact." *Id*. Rather, a person must be able to show an "injury in fact that must be concrete and particularized, as well as actual or imminent." *Id*. "It cannot be conjectural or hypothetical." *Id*.

Here, like the unaffiliated plaintiff in *Carney* who wanted to be a judge in Delaware where there were political party requirements, Plaintiffs assert that each wants to serve on the State Board of Elections but cannot do so due to their unaffiliated status. Accordingly, each bears the individualized burden of showing a concrete, particularized injury beyond the assertion that a grievance is suffered by all North Carolinians who might like to see unaffiliated voters on boards of elections. *See id.* at 499. Plaintiffs attempt to assert a concrete, particularized injury by alleging that they are "willing to serve," (Doc #11, ¶ 5), "should be able to serve," (*id.* ¶ 7), "would like to serve," (*id.* ¶ 9), are "interested in serving," (*id.* ¶ 11), and "wish[ ] to serve," (*id.* ¶

6

13). But there are no other allegations about each Plaintiffs' concrete and particularized injury that would differentiate each of them over any member of the general population who might wish, like, or believe that unaffiliated voters should be able to serve on the Board of Elections. This type of bare bones allegations of "some day intentions do not support a finding of the actual or imminent injury that our cases require." *Carney*, 141 S. Ct. at 502. Rather, as the Court in *Carney* noted, a plaintiff can demonstrate she is able and ready, in part, by having applied to the position she is seeking when she was affiliated with one of the major parties. *Id*. The same is true here and the absence of allegations on that point are fatal to standing. *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013) (Courts "are powerless to create our own jurisdiction by embellishing otherwise deficient allegations of standing."). Plaintiffs Smith, Horton, and Faires all allege they were registered with major parties but do not allege that any of them served or sought to be nominated during the period they were affiliated with either the Republican or Democratic parties. And Plaintiffs Effron and Daye fair no better. Similar to the other Plaintiffs, neither Effron nor Daye alleges to have sought to catch the Governor's eye by currently serving as chair on any of the county boards of elections, where gubernatorial appointments are not required to be associated with either major political party. *See* N.C. Gen. Stat. § 163-30.

Plaintiffs, by failing to allege that they have sought the local boards of elections positions that are available to them, and by failing to allege that they would definitively seek nomination (presumptively from the Governor) if it were not for section 163-19, fall far short of their burden to allege a sufficient, particularized injury.

Moreover, given the undefined characteristics of unaffiliated voters, it is hard to find a basis on which Common Cause or the individual plaintiffs can represent more than 2.5 million unaffiliated voters, (Doc #11, ¶ 29). Standing is an individualized assessment. An overall interest "to vindicate the constitutional validity of a generally applicable [ ] law" is not Article III standing. *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013). "In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). This applies equally to associations and individuals asserting the rights of third parties. *See Am. Legal Found. v. F.C.C.*, 808 F.2d 84, 89 (D.C. Cir. 1987) ("When an organization seeks standing to litigate, it may do so in two capacities. First, and most obviously, it may sue on its own behalf. In this institutional capacity, the organization's pleadings must survive the same standing analysis as that applied to individuals.").

8

Common Cause, on its own behalf, lacks standing. As an institution, it cannot serve in public office under any set of circumstances. Moreover, there are no assertions as to how the lack of unaffiliated voters on the Board of Elections has caused Common Cause to divert its focus or limited resources from its other activities in an effort to secure potentially non-member, unaffiliated voters on the Board of Elections. *Cf. Action NC v. Strach*, 216 F. Supp. 3d 597, 617–18 (M.D.N.C. 2016) (citing cases of allegations like this supporting organizational standing). "The Supreme Court's teachings with respect to an organization's injury in fact [ ] require more than allegations of damage to an interest in seeing the law obeyed or a social goal furthered." *Am. Legal Found.*,, 808 F.2d at 92.

Common Cause's associational or representative standing is lacking as well. Representational standing is present for an organization when "(1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *N. Carolina Motorcoach Ass'n v. Guilford Cnty. Bd. of Educ.*, 315 F. Supp. 2d 784, 796 (M.D.N.C. 2004). Here, Common Cause notes that its membership is comprised of voters who are affiliated with major political parties as well as unaffiliated voters. (Doc #11, ¶ 1). Common Cause fails to allege how not having unaffiliated voters on the State

Board of Elections has harmed its members. Members who are Republicans or Democrats are certainly not harmed. And the potential conflicts among registered unaffiliated voters make it virtually impossible to say how one association could represent all of them. Unaffiliated does not equate to independence or neutrality. Unaffiliated voters are not affiliated with each other; that they desire not to be affiliated with any political party is all that one can say about them collectively. And that is not an immutable characteristic because people can change their status for any reason or no reason at all. As the Court in *Maryland Highways* noted, the third associational standing "prong is not met when conflicts of interest among members of the association require that the members must join the suit individually in order to protect their own interests." *Maryland Highways Contractors Ass'n, Inc. v. State of Md.*, 933 F.2d 1246, 1252 (4th Cir. 1991). Because it is not clear that unaffiliated voters even universally have a desire to see unaffiliated voters serve on the State Board—some may actively oppose such activity—it must be equally apparent that one organization cannot speak for all of them.

The Governor's involvement further complicates Plaintiffs' standing because there is more than just a law preventing his or her service on the State Board. Even if unaffiliated members could serve on the State Board, the authority to appoint those members belongs to the Governor. And courts

10

"have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013). "For an injury to satisfy the causation element, it must result from the actions of the respondent, not from the actions of a third party beyond the Court's control." *Bethel v. Rogers*, No. 1:20CV330, 2022 WL 4585809, at *4 (M.D.N.C. Sept. 29, 2022). Plaintiffs each allege, in varying degrees of desire, that he or she should be appointed to the State Board of Elections, but the person who makes those appointments—the Governor—is not before this Court. Plaintiffs certainly do not allege that a governor would appoint them to the Board absent this law; they only argue that they are qualified to serve. "Any prediction how the Executive Branch might eventually implement this general statement of policy is no more than conjecture at this time." *Trump v. New York*, 141 S. Ct. 530, 535 (2020).

II.  Defendants, as legislators sued in their official capacities,[1] are entitled to Eleventh Amendment immunity.

---

[1] Defendants are not being sued in their individual capacity, (*see* Doc #11, ¶¶ 14-15), therefore a discussion regarding the applicability of legislative immunity to shield any individual liability does not appear necessary at this time. Defendants do not intend to waive legislative immunity, but instead are focusing on the claims as drafted.

Case 1:22-cv-00611-WO-JLW   Document 15   Filed 10/14/22   Page 11 of 29

Even assuming this Court were to determine that at least one Plaintiff had standing to bring a claim, Plaintiffs' claims are barred by the Eleventh Amendment.[2]

Defendants are entitled to dismissal under the doctrine of sovereign immunity. It is well settled that the Eleventh Amendment affords States, their agencies, and officials immunity from suit in federal court. *See Allen v. Cooper,* 895 F.3d 337, 347 (4th Cir. 2018). Where applicable, this immunity is also typically absolute. As the Fourth Circuit has observed, Supreme Court precedent makes clear that a state must expressly and unambiguously consent to suit in federal court to waive its sovereign immunity. *Id.* (citing *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305–06 (1990)). Indeed, such consent is not found even when a state expresses its intention to sue or be sued. *See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999).

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). "As such, it is no different from a suit against the State itself," *id.*, and Plaintiffs need an

_____

[2] Though "not a true limit on the subject-matter jurisdiction of federal courts, the Eleventh Amendment is a block on the exercise of that jurisdiction." *McCants v. Nat'l Collegiate Athletic Ass'n*, 251 F. Supp. 3d 952, 955 (M.D.N.C. 2017) (discussing the jurisdictional scope of the Eleventh Amendment.

exception to the Eleventh Amendment to seek relief. The narrow exception to sovereign immunity arising from *Ex Parte Young* is inapplicable here. 209 U.S. 123 (1908). While the "fiction" of *Ex Parte Young* only applies in claims for prospective relief, the challengers must also show some connection between the challenged act and the ability of the defendants to <u>*enforce*</u> the change, assuming a favorable outcome for the plaintiffs. *See, e.g.*, *Allen,* 895 F.3d at 355 (citing *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 550 (4th Cir. 2014) ("[A] governor cannot be enjoined by virtue of his general duty to enforce the laws," nor can an "attorney general ... be enjoined where he has no specific statutory authority to enforce the statute at issue.")). "The requirement that there be a relationship between the state officials sought to be enjoined and the enforcement of the state statute prevents parties from circumventing a State's Eleventh Amendment immunity." *Hutto*, 773 F.3d at 550. Defendants, as legislators who *enact* laws, tend to have no expressed role in enforcement of the laws once they are enacted. Legislators enforcing the law would likely implicate separation of powers concerns. *See, e.g., Cooper v. Berger*, 370 N.C. 392, 414, 809 S.E.2d 98, 111 (2018) ("[S]eparation-of-powers violations can occur when one branch exercises power that the constitution vests exclusively in another branch or when the actions of one branch prevent another branch from performing its constitutional duties."). Enforcement of laws would fall to someone within the executive branch. In the absence of any applicable

13

exception, immunity from suit is the default, and Defendants are thus protected.

III.   There is no First Amendment right to serve in a policymaking election administration role, and requiring party affiliation in such a role is rationally related to legitimate government interest, thereby negating an equal protection challenge.

*First Amendment*

Plaintiffs allege that section 163-19 violates their freedom of speech and freedom of association by requiring affiliation with either of the current two major political parties as a prerequisite to serving as an election administration official. (Doc. #11, ¶¶ 50, 59). Courts have dismissed similar infringement arguments and this Court should too.

To survive a motion to dismiss for failure to state a claim, Plaintiff cannot rely on "unwarranted inferences, unreasonable conclusions, or arguments," *Does 1-5 v. Cooper*, 40 F. Supp. 3d 657, 675 (M.D.N.C. 2014), but instead must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "To be facially plausible, a claim must plead factual content that allows the court to draw the reasonable inference that the defendant is liable and must demonstrate more than a sheer possibility that a defendant has acted unlawfully."  *Calloway v. Durham Cty. Pub. Sch. Bd. of Educ.*, 1:15-CV-187, 2016 WL 634878, at *6 (M.D.N.C. Feb. 17, 2016) (cleaned up).

14

"Dismissal of a complaint is proper where a plaintiff's factual allegations fail to produce an inference of liability strong enough to nudge the plaintiff's claims across the line from conceivable to plausible." *Cooper*, 40 F. Supp. 3d at 675 (cleaned up).

Section 163-19(b) does not prohibit anyone from affiliating – or not affiliating – with any political party. The law neither restricts voter choice nor anyone's ability to run for elected office. Rather, N.C. Gen. Stat. § 163-19(b) governs who is eligible to serve on the State Board of Elections. The question is then whether section 163-19(b) infringes upon a First Amendment-protected right to public service. It does not. "There is simply no abstract constitutional right to be appointed to serve as an election [official]." *Werme v. Merrill*, 84 F.3d 479, 484 (1st Cir. 1996).

While the Supreme Court has established that the speech or political association of government employees cannot be wholly constrained, government employees do not have the same unfettered rights as citizens, *see Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563, 568 (1968), and, when in "policymaking" positions, can be subject to adverse employment consequences if their views do not line up with that of the administration. *See, e.g., Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990); *Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976). Under *Elrod* and *Branti*, the government may *require* partisan

15

affiliation for an appointment if the position at issue is a policymaking role for which "political affiliation is a reasonably appropriate requirement for the job in question." *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996). *See, e.g., Rash–Aldridge v. Ramirez*, 96 F.3d 117 (5th Cir.1996) (finding no First Amendment violation where council member was removed for failing to support the council's plan because she had been appointed rather than elected). "If these [policymaking] jobs are filled with employees who take a view different from the administration, then these employees could thwart the government's ability to enact the policies it had been elected to advance." *Powers v. Richards*, 549 F.3d 505, 509 (7th Cir. 2008). The law treats policymaking appointments under the same *Elrod/Branti* exception to First Amendment. As aptly noted in *McKinley v. Kaplan*, 262 F.3d 1146, 1151 (11th Cir. 2001), appointees in policymaking positions do not have First Amendment claims when his or her contrary view could thwart the policymaking goals of their appointor.

> By speaking out publicly and signing a resolution against a policy proposed by her appointing authority and adopted by a unanimous County Commission, we think it fair to say that Appellant did not represent either party's interests. As such, we do not believe that the First Amendment imposes on Kaplan[, as the appointer,] or the County Commission an obligation to retain her as an advisory board appointee.

*Id.*; s*ee, e.g., Jenkins v. Medford*, 119 F.3d 1156, 1160 (4th Cir. 1997) (dismissal of deputy sheriffs not a violation of First Amendment rights of those deputies).

It follows then that Plaintiffs cannot use the First Amendment to end run Section 163-19(b)'s partisan affiliation requirement. Political affiliation has long been held to be an appropriate criterion for selection and service in policymaking positions. In *Davis v. Martin*, 807 F. Supp. 385, 386 (W.D.N.C. 1992), the plaintiff challenged as violative of his First Amendment rights a statute that required judicial vacancies to be filled by the Governor from lists submitted by the district bar of the names of three people residing in that district and who are members of the same political party as the vacating judge. The court held that "there is no constitutional impediment to the North Carolina General Assembly's decision to fill judicial vacancies only with nominees of the same political affiliation as the vacating judge," and granted the defendant's motion to dismiss. *Davis v. Martin*, 807 F. Supp. 385, 388 (W.D.N.C. 1992); *see also Rodriguez v. Popular Democratic Party*, 457 U.S. 1 (1982), (finding that a Puerto Rican statute that allowed only members of a deceased legislator's political party to appoint his successor and excluded members of an opposition political party from the process did not violate freedom of association).

17

Here, the North Carolina Supreme Court has already determined that the State Board is a policymaking body. *Cooper v. Berger*, 370 N.C. 392, 415-16, n.11, 809 S.E.2d 98, 112-13 (2018) ("[T]he General Assembly has, in the exercise of its authority to delegate the making of interstitial policy decisions to administrative agencies, given decision making responsibilities to the executive branch by way of the [State] Board."). The Court in *Cooper*, having determined that the State Board was a policymaking board and relying on its decision in *State ex rel. McCrory v. Berger*, 368 N.C. 633, 645, 781 S.E.2d 248, 256 (2016), went on to hold that the Governor must have the "ability to affirmatively implement the policy decisions that executive branch agencies subject to his or her control are allowed." *Cooper v. Berger*, 370 N.C. 392, 415, 809 S.E.2d 98, 112 (2018). Indeed, the Court referred "to the ability of the executive branch to make these discretionary determinations as the effectuation of 'the Governor's policy preferences.'" *Cooper v. Berger*, 370 N.C. 392, 415, n.11, 809 S.E.2d 98, 113 (2018). Scrutiny of the political affiliation of elections board members is necessary, and as *Cooper* instructs, a state constitutional requirement, to ensure that the political views and priorities of the Governor are capable of being carried out. Hence, the exception to the protection of the First Amendment in *Elrod/Branti* applies. A panel of North Carolina Superior Court judges solidified that determination when that panel held that adding an unaffiliated voter to a nine-member State Board

18

otherwise comprised of 4 Democratic party nominees and 4 Republican party nominees unconstitutionally thwarted the Governor's ability to control or influence the policymaking decisions of the State Board. (*See* Exhibit A, Attached Exhibit Opinion).

While it is conceivable that a person with no party affiliation may want to serve in a political public office, federal and state courts have held that it is not an infringement of that person's First Amendment rights to limit service in policymaking positions to those people with views that match that of the appointing policymaker. Accordingly, it is not a First Amendment violation for North Carolina to create a deliberately bipartisan commission in which representatives of the top two political parties in the state—whichever parties those may be—must find common political ground for the administration of elections. *See, e.g., Morrison v. City of Reading*, CIV.A. 02-7788, 2007 WL 764034, at *9 (E.D. Pa. Mar. 9, 2007) (while not allowed to snuff out political opinion, appointing authorities can determine governmental interests without every viewpoint being represented on a commission); *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981) ("Moreover, the Commission is inherently bipartisan in that no more than three of its six voting members may be of the same political party, § 437c(a)(1), and it must decide issues charged with the

dynamics of party politics, often under the pressure of an impending election.").

<u>Fourteenth Amendment</u>

Plaintiffs also allege that section 163-19 "discriminates against plaintiffs, and all other unaffiliated voters, by denying them the same opportunity as registered Democrats and Republicans to be a member of the State Board of Elections and participate equally in the supervision, management, and administration of elections in North Carolina." (Doc #11, ¶ 59) and therefore violates the Fourteenth Amendment's equal protection clause. These allegations fall well short of stating a claim.

"For equal protection purposes, unless a classification infringes upon a fundamental right or a suspect class, a law or ordinance must only be rationally related to a legitimate state interest." *Shanks v. Forsyth Cty. Park Auth., Inc.*, 869 F. Supp. 1231, 1235 (M.D.N.C. 1994) (*citing City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam)). Plaintiffs do not allege that unaffiliated voters are members of a suspect class. Political party (or, in this case, lack of affiliating with a political party) has not been found to be a suspect class. *See Greenville Cty. Republican Party Exec. Comm. v. South Carolina*, 824 F. Supp. 2d 655, 669 (D.S.C. 2011) ("this court is unfamiliar with, and Plaintiffs have not cited, any authority categorizing political parties as an inherently suspect class. Therefore, any discrimination

against political parties may be justified if it is rationally related to a legitimate state interest.").

Plaintiffs try to infer that because the right to vote is a fundamental right that the right to serve in election administration is also a fundamental right. (*See* Doc #11, ¶ 58). Not so. The United States Supreme Court has "rejected claims that the Constitution compels a fixed method of choosing state or local officers or representatives." *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982). Plaintiffs' right to vote is *not* at issue in this action. *See Pirincin v. Bd. of Elections of Cuyahoga Cty.*, 368 F. Supp. 64, 69 (N.D. Ohio 1973) ("[It has been] concluded that the right to vote, as that right is protected by the United States Constitution, is not impinged by the Ohio scheme of selecting members of the boards of elections."). "The effectiveness of [Plaintiffs'] ballot is in no way impaired by the composition of the county boards of elections and [their] First Amendment rights, therefore, are not violated." *Id.* at 75. Rather, what is at issue is Plaintiffs' purported "right" to be appointed to the State Board, but there is no such constitutional right. *See, e.g., Werme v. Merrill*, 84 F.3d 479, 484 (1st Cir. 1996) ("There is simply no abstract constitutional right to be appointed to serve as an election inspector or ballot clerk.").

Absent suspect class or a fundamental right, "rational basis is the appropriate standard of review." *Shanks*, 869 F. Supp. at 1235.

> When applying rational basis review, courts presume the constitutionality of the ordinance's classification. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.

*Shanks*, 869 F. Supp. at 1235–36. "To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to governmental classifications." *Giarratano*, 521 F.3d at 303. If the plaintiff fails to make sufficient allegations, his complaint is subject to dismissal under Rule 12(b)(6). *See, e.g., id.* at 305.

North Carolina's choice to ensure bipartisan representation on the State Board has many rational justifications. First, courts have long recognized the states' legitimate interest in securing "the integrity of the electoral process." *Storer v. Brown*, 415 U.S. 724, 731 (1974); *see Werme*, 84 F.3d at 486. The appointment of members from the top-two oppositional parties to the boards overseeing critical aspects of elections serves this purpose. Members of the State Board exercise sensitive duties over the conduct of elections. Involving members of the principal opposing political parties in these tasks helps ensure that they are carried out in an even-handed manner and helps to prevent either party from exercising complete control without accountability over elections administration. *See Pirincin*,

368 F. Supp. at 71 (holding that Ohio's similar requirement for bipartisan appointments "creates a county elections board with built-in checks and balances"); *Baer v. Meyer*, 728 F.2d 471, 476 (10th Cir. 1984) (noting that selecting poll watchers from the main two political parties "insure[s] against tampering with the voting process").

Limiting representation to party affiliates allows for a more efficient selection of members to the Bipartisan Board from the millions of registered voters in North Carolina. Plaintiffs offer no explanation as to how "unaffiliated" voters are similarly situated such that selection of one unaffiliated voter would represent any other unaffiliated voters. Because there are many reasons why a person may register as unaffiliated in North Carolina, there is not a common set of ideologies, principles, or beliefs that unites unaffiliated voters. Adding more parties (and nonparties) to oversee elections could make the boards operate less efficiently and lead to confusion and mistakes. *Werme*, 84 F.3d at 486; *Baer*, 728 F.2d at 476; *Pirincin*, 368 F. Supp. at 72.

Second, bipartisan appointments serve to promote public confidence in elections, an objective that the Supreme Court has recognized as legitimate. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197 (2008). Politics in the United States and in North Carolina are dominated by two political parties. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 367

23

(1997); *Libertarian Party v. State*, 365 N.C. 41, 44, 707 S.E.2d 199, 201–02 (2011). Consequently, millions of registered Democrats, Republicans, and unaffiliated voters support candidates from either the Republican or Democratic parties. Therefore, counterbalancing Democrats with Republicans as election officials ensures that the public can have the utmost confidence in the electoral process. *See MacGuire v. Houston*, 717 P.2d 948, 954 (Colo. 1986) ("[P]airing Democrats and Republicans as election monitors provides an appearance of propriety to the voters.").

Third, bipartisan appointments to the State Board also promote efficient election administration, which the Supreme Court has recognized as a legitimate governmental interest. *See Bullock v. Carter*, 405 U.S. 134, 145 (1972) ("[T]he State understandably and properly seeks to prevent the clogging of its election machinery . . . ."). The First Circuit in *Werme* accepted New Hampshire's efficiency justification for limiting election official appointments to the two main political parties. *See* 84 F.3d at 486. The court held, "[c]ommon sense suggests that if election inspectors and ballot clerks become too numerous, they will merely get in each other's way and thus frustrate the moderator's ability to afford close supervision." *Id.* The Northern District of Ohio similarly accepted the administrative efficiency rationale with regard to bipartisan elections board appointments. *Pirincin*, 368 F. Supp. at 72. Accordingly, North Carolina's choice to limit certain

24

elections board appointments to affiliates of the dominant political parties is rationally related to the legitimate objective of efficient election administration.

Fourth, the bipartisan makeup of the State Board ensures that the prevailing policy views on election administration are represented on the boards. Elections board members are policymakers, as explained more fully above. Although election administration must be accomplished without favor to any particular party, the main political parties have valid policy disagreements with respect to election administration. For this reason, the Governor sued to overturn a law that kept him from maintaining executive control over the majority of the members of the State Board. *See Cooper*, 370 N.C. at 415, 420–21, 809 S.E.2d at 112, 115–16. Representation from the Democratic and Republican parties ensures that the policy views on these boards reflect the predominant strains of thought among the public with respect to the administration of elections. To this end, it was rational for the legislature to include the two main parties but not representatives of unaffiliated voters, because unlike the political parties, unaffiliated voters as a collective, have no discernible policy views. *See Pirincin*, 368 F. Supp. at 72 ("[I]t is apparent that one or two independent voters who might be appointed could not truly serve as adequate representatives of all independent voters. Each independent voter can really only represent himself."). The legislature,

therefore, could reasonably conclude that reserving board appointments to Democratic and Republican representatives served the purpose of reflecting the public's divergent views on election administration.

North Carolina's section 163-19 is not unique. In fact, at least eight other states have comparable statutes that effectively create bipartisan election boards comprised of members from the two major political parties. See 10 ILL. COMP. STAT. 5/1A-2 (West 2022); MD. CODE ANN., ELECTION LAW § 2-101(e)(1) (West 2022); N.Y. ELECTION LAW § 3-100(1) (McKinney 2022); OKLA. STAT. tit. 26, § 2-101.1 (2022); VA. CODE. ANN. § 24.2-102 (West 2022); WIS. STAT. ANN. § 7.20(2) (West 2022); HAW. REV. STAT. ANN. § 11-7 (West 2022); S.C. CODE ANN. § 7-3-10 (2022). Notably, of these eight comparable statutes, only one has faced a similar constitutional challenge—and prevailed. *See Green Party of the State of N.Y. v. Weiner*, 216 F.Supp.2d 176, 192–96 (S.D.N.Y. 2002). Likewise, here the Court should not find merit in Plaintiffs' argument that our legislature's vesting of authority to members of the major political parties to regulate elections somehow unconstitutionally burdens unaffiliated voters' rights.

Having failed to allege facts sufficient to overcome the presumption of rationality and in light of readily apparent justifications, Plaintiffs' claim under the Fourteenth Amendment should be dismissed.

CONCLUSION

For the foregoing reasons, this Court should grant Defendants' motions

to dismiss and dismiss Plaintiffs' Complaint.

Respectfully submitted this 14th day of October, 2022.

*/s/ Phillip J. Strach*

D. Martin Warf
N.C. State Bar No. 32982
Phillip J. Strach
N.C. State Bar No. 29456
Nelson Mullins Riley & Scarborough LLP
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612
Phone: (919) 329-3800
Fax: (919) 329-3799
martin.warf@nelsonmullins.com
phil.strach@nelsonmullins.com
*Counsel for Defendants*

## CERTIFICATE OF WORD COUNT

Counsel for Defendants certify that pursuant to LR 7.3(d) of the Local Civil Rules, the foregoing Memorandum is fewer than 6,250 words (including the body of the brief, headings, and footnotes, but excluding the caption, signature blocks, certificate of service, this certificate of compliance, and exhibits) as reported by the word-processing software.

_/s/ Phillip J. Strach_

Phillip J. Strach

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such to the following:

Edwin M. Speas, Jr.
Caroline P. Mackie
Poyner Spruill LLP
P. O. Box 1801
Raleigh, NC  27602-1801

Michael Crowell
1011 Brace Lane
Chapel Hill, NC  27516

*Attorneys for Plaintiff*

*/s/ Phillip J. Strach*
D. Martin Warf
N.C. State Bar No. 32982
Phillip J. Strach
N.C. State Bar No. 29456
Nelson Mullins Riley & Scarborough LLP
4140 Parklake Avenue, Suite 200
Raleigh, NC  27612
Phone:  (919) 329-3800
Fax:  (919) 329-3799
martin.warf@nelsonmullins.com
phil.strach@nelsonmullins.com
*Counsel for Defendants*