UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Docket No. 1:22-cv-611-WO-JLW

| | |
|---|---|
| COMMON CAUSE, ELIZABETH MARION SMITH, SETH EFFRON, JAMES M. HORTON, TYLER C. DAYE, and SABRA J. FAIRES,<br><br>Plaintiffs,<br><br>v.<br><br>TIMOTHY K. MOORE, Speaker, North Carolina House of Representatives; and PHILLIP E. BERGER, President Pro Tempore, North Carolina Senate; and ROY A. COOPER, III, Governor of North Carolina,<br>*(all in their official capacity only)*,<br><br>Defendants. | **PLAINTIFFS' RESPONSE IN OPPOSITION TO GOVERNOR COOPER'S MOTION TO DISMISS** |

Defendant Governor Cooper has moved to dismiss the Second Amended Complaint. (Doc. 34). The Court should deny the motion.

In this case, plaintiffs seek a declaration that North Carolina's law rendering more than 2.5 million citizens ineligible for appointment to the State Board of Elections (the "State Board") violates the First and Fourteenth Amendments. Plaintiffs do not seek a court order appointing them to the State Board; they only seek an order making them and every other unaffiliated voter in North Carolina eligible for appointment to the State Board. Nor do they

seek an order that forces the Governor to appoint anyone who does not share his policy views—an order that would violate the separation of powers principles recognized and reiterated in *Cooper v. Berger*, 370 N.C. 392, 809 S.E.2d 98 (2018). All parties agree that the Governor is entitled to appoint a majority of members to the State Board who share his "views and priorities." *Id.* at 416, 809 S.E.2d at 112. Plaintiffs do not seek to change that well-settled principle. Instead, plaintiffs simply seek removal of the statutory ban which prohibits the Governor from appointing anyone but Democrats or Republicans to the State Board.

A fair reading of the Second Amended Complaint confirms that plaintiffs have standing to seek this relief and that they have sufficiently alleged First Amendment and Equal Protection claims. Simply because this case is one of first impression does not support dismissal at this stage. *Wright v. North Carolina*, 787 F.3d 256, 265 (4th Cir. 2015); *Senderra RX Partners, LLC v. Blue Cross & Blue Shield of N.C.*, No. 1:18-cv-871, 2019 WL 9633642, at *5 (M.D.N.C. May 23, 2019) ("Moreover, the fact that the contours of this cause of action are unsettled militates against dismissal, not in favor of it.").

## STATEMENT OF FACTS

Plaintiffs incorporate their statement of facts from their Response in Opposition to the Legislative Defendants' Motion to Dismiss. Plaintiffs'

2

Response in Opposition to Legislative Defendants' Motion to Dismiss ("Plaintiffs' Response"), Doc. 29, at 2–3.

## ARGUMENT

### I. All Plaintiffs have Standing.

Governor Cooper contends on two grounds that no plaintiff has standing to pursue this lawsuit. Neither contention has merit.

The Governor's first contention is that "plaintiffs do not have representational standing to seek representation on the Board on behalf of unaffiliated voters as a class." Governor Cooper's Brief in Support of Motion to Dismiss ("Gov's Br."), Doc. 35, at 6. This contention must logically be limited to Common Cause. Only Common Cause sues in its representational capacity; the individual plaintiffs sue only in their individual capacities. *Compare* Sec. Am. Compl., Doc. 20, ¶ 2 *to* ¶¶ 3–13.

An association which seeks only declaratory or injunctive relief against the enforcement of a statute that injures some of its members has standing to pursue a lawsuit on behalf of its members. *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 515 (1975) (where an association seeks declaratory or injunctive relief on behalf of its members "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured"); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 341–45

3

(1977) (state agency had standing to challenge North Carolina statute regulating the labeling of apples shipped to North Carolina on behalf of the state's apple industry); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986) (union had standing to challenge federal statute that provided unemployment benefits to its members).

This is such a case. Common Cause has more than 30,000 members in North Carolina. It "is dedicated to ensuring fair and open elections in which all citizens are encouraged and allowed to participate <u>regardless of party</u>." Sec. Am. Compl. ¶ 1 (emphasis added). And it seeks only declaratory and injunctive relief against the enforcement of a statute that bans its members who are registered unaffiliated from service on the State Board. *Id.* at ¶ 2. The Governor suggests that such representation can be provided only through a class action. *See* Gov.'s Br. at 7 ("Plaintiffs do not have the right to seek relief on behalf of unaffiliated voters as a class."). That argument has been rejected by the Supreme Court because it "fails to recognize the special features, advantageous both to the individuals represented and to the judicial system as

4

a whole, that distinguish suits by associations on behalf of their members from class actions." *Int'l Union*, 477 U.S. at 289.[1]

The Governor's second standing contention is that the injuries alleged by the individual plaintiffs are not sufficiently concrete "to differentiate them from the millions of other unaffiliated voters." Gov.'s Br. at 10. This contention fails in the first instance because it ignores the allegations of the complaint. The individual plaintiffs are long-time, unaffiliated voters who are qualified to serve on the State Board and interested in serving on the State Board, but are denied that opportunity by North Carolina's law because of their choice not to affiliate with either the Democratic or Republican Party. Sec. Am. Compl., Doc. 20, ¶¶ 3–13. The fecklessness of this contention is illustrated by the Governor's suggestion that to obtain standing plaintiffs would have to allege that "they would have been nominated (and selected by the Governor) to serve on the Board if not for Section 163-19." Gov.'s Br. at 10. But Section 163-19

---

[1] The Governor argues that unaffiliated voters have no "common goals" and are not a "discrete, stable group of persons." Gov.'s Br. at 7. What unaffiliated voters have in common—sufficient for standing purposes—is their exclusion from the State Board based on their choice of political affiliation. Moreover, as a factual matter, scholars have concluded that "unaffiliated voters in North Carolina hold distinct political beliefs that fall somewhere between the two major parties on most issues." J. Michael Bitzer, Christopher A. Cooper, Whitney Ross Manzo, & Susan Roberts, Growing and distinct: The Unaffiliated voter as unmoored voter, Social Science Quarterly, 103:1598 (Rev. Oct. 17, 2022).

5

does exist, and by its express terms it renders the plaintiffs ineligible for either nomination or selection to the State Board and makes it unlawful for the Governor to appoint them.

Plaintiffs have adequately alleged concrete injuries in fact, and the Governor's motion to dismiss for lack of standing should be denied.

## II. Plaintiffs have stated valid claims under the First Amendment and Equal Protection clause.

### A. The Court should analyze the claim under *Anderson-Burdick*, not *Elrod-Branti*.

The Governor assumes that *Elrod-Branti* controls the First Amendment analysis in this case, and he does not mention *Anderson-Burdick*. This is in error for all of the reasons explained in Plaintiffs' Response in Opposition to the Legislative Defendants' Motion to Dismiss. Plaintiffs' Response, Doc. 29, pp. 23–25.

The Governor tries to ignore the overriding fact that this case is about voting, despite the unsettling proof in the last few years that election boards determine who gets to vote, who gets to run for office, and whose votes count. Accordingly, *Anderson-Burdick* is the appropriate test because its purposes are (a) to ensure that "democratic processes" are "fair and honest" and (b) to "maintain the integrity of the democratic system." *Burdick v. Takushi*, 504 U.S. 428, 433, 441 (1992). It is appropriately a test for infringements on hybrid

First Amendment and Equal Protection rights. Daniel P. Tokaji, *Voting is Association*, 43 Fla. St. U. L. Rev. 763, 776 (2016). The statute regulates the "mechanics of the electoral process," which places it squarely within *Anderson-Burdick*. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995). "When a regulation triggers more associational-rights aspects of the First Amendment, circuit courts have applied *Anderson-Burdick*." Andrew C. Maxfield, Litigating the Line Drawers: Why Courts Should Apply *Anderson-Burdick* to Redistricting Commissions, 87 U. Chi. L. Rev. 1845, 1880 (2020). *Anderson-Burdick* is a "useful standard for evaluating various forms of election laws," *id.* at 1885, and it should be used here.

### B. Whether analyzed under *Anderson-Burdick* or *Elrod-Branti*, the ban on unaffiliated service is unconstitutional.

As plaintiffs described in their brief in opposition to the legislative defendants' motion to dismiss, this case is about the severe burden on the fundamental rights to vote and associate. Plaintiffs' Response, Doc. 29, at 15–19. The appropriate standard under *Anderson-Burdick*, therefore, is strict scrutiny, not rational basis. Under strict scrutiny, the defendants must show that the ban on unaffiliated service is narrowly tailored to advance a compelling governmental interest. *DeLaney v. Bartlett*, 370 F. Supp. 2d 373, 377 (M.D.N.C. 2004).

7

The right to vote extends to all phases of the voting process, including the "manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000). Voters enjoy a right to "participate equally in the electoral process." *Dem. Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019), and that process is more than simply casting a ballot. The severe burden on plaintiffs and other unaffiliated voters is not justified by any compelling purpose. *See* Plaintiffs' Response, Doc. 29, at 20–22.[2]

### 1. There is no compelling interest to justify the exclusion of unaffiliated voters from the State Board.

The Governor's interest in maintaining control over the policy views of the State Board does not justify the burden. In fact, that interest is not implicated by plaintiffs' challenge. Even if the ban were invalidated, the Governor would still be entitled to appoint individuals who share his policy views. He can ensure that the policies of his administration are carried out by his appointees. The separation-of-powers principles enunciated by the North Carolina Supreme Court in *Cooper v. Berger*, 370 N.C. 392, would remain intact.

---

[2] Nor is it supported by any rational basis. *See* Plaintiffs' Response, Doc. 29, at 26–28, and Sec. Am. Compl., Doc. 20, ¶¶ 41–43 (explaining why the ban is "ill-conceived," "arbitrary and capricious and not rational," and "destructive of our democracy.").

8

Nor do the state's interests in the stability of the two-party system or public confidence in election administrations justify the ban. As plaintiffs have explained, there is "no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them." *Williams v. Rhodes*, 393 U.S. 23, 32 (1968). "Historically political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in time made their way into the political mainstream." *Anderson v. Celebrezze*, 460 U.S. 780, 794 (1983). Preservation of the two-party monopoly over election administration in North Carolina is not justified when it comes at the expense of an outright ban on unaffiliated voters. *See id.* at 801–04. Nor can it logically be argued that voter confidence is enhanced by excluding the largest share of voters in the state simply because they choose not to affiliate with the two major political parties.

### 2. The ban on unaffiliated voters is not justified by the *Elrod-Branti* patronage line of cases.

Application of *Elrod-Branti* and the political patronage line of cases in this instance would be "far afield" from the typical patronage case. *Smith v. Frye*, 488 F.3d 263, 270 (2007). This case is about the two major political parties discriminating against voters who choose to be unaffiliated with either

9

of them. It is not about the failure to appoint a specific individual to the State Board.

The principles established by the patronage cases reflect a balancing of the interests of all citizens in maintaining our system of representative government and every person's right of free expression and association. *See Smith*, 488 F.3d at 268–70. In the context of this case, those principles require the court to balance Governor Cooper's interest in ensuring that he can appoint a majority of the members of the State Board who share his policy preferences regarding the right to vote and the conduct of elections against the plaintiffs' right to register to vote as unaffiliated. But the relief the plaintiffs request as a remedy for the infringement of their right not to register as a Democrat or Republican in no way diminishes the Governor's capacity to appoint a majority of the members of the State Board who share his policy views. There are many qualified citizens among the 2.5 million North Carolinians who have chosen to register unaffiliated who share the Governor's policy preferences about elections.

Moreover, as plaintiffs described in their brief in opposition to the legislative defendants' motion to dismiss (Plaintiffs' Response, Doc. 29, at 25–26), the political patronage exception does not make sense for the State Board, whose members are required by law to "bear true allegiance to the State of

10

Case 1:22-cv-00611-WO-JLW   Document 36   Filed 05/30/23   Page 10 of 18

North Carolina," cannot serve or hold any political position, cannot engage in any sort of electioneering, and cannot make political contributions. N.C. Gen. Stat. § 163-19. By its own terms, Section 163-19 places a check on the Governor's ability to engage in political patronage for State Board positions, confirming that *Elrod-Branti* should not apply.

Even if it were otherwise arguable that patronage considerations are relevant for the State Board, the board's judicial function clearly makes it improper. In the first phase of James Adams' challenge to the exclusion of unaffiliated voters from appointment to Delaware's courts the Third Circuit explained that a patronage exception could not be applied to judges:

> This outcome is clear from the principles animating *Elrod* and *Branti*. The purpose of the policymaking exception is to ensure that elected officials may put in place loyal employees who will not undercut or obstruct the new administration. If a job 'cannot properly be conditioned upon allegiance to the political party in control,' the policymaking exception is inappropriate. Judges simply do not fit this description. . . . Independence, not political allegiance, is required of Delaware judges.

*Adams v. Governor of Del.*, 922 F.3d 166, 178–79 (3d Cir. 2019), *vacated and remanded on other grounds*, 141 S. Ct. 493 (2020). The same reasoning applies here. Independence, not political allegiance, is required for a State Board that investigates election misconduct, holds evidentiary hearings, and decides judicially whether new elections should be ordered.

11

### 3. Cases about appointment of a single election administrator are not relevant.

To support his argument that *Elrod-Branti* applies, the Governor cites several cases not cited by the legislative defendants. Gov's Br. at 13–14. In *Peterson v. Dean*, 777 F.3d 334, 345 (6th Cir. 2015), the court applied *Elrod-Branti* to recognize a patronage exception for a Tennessee county election administrator. The courts reached similar results in *Summe v. Kenton County Clerk's Office*, 604 F.3d 257, 267 (6th Cir. 2010) (deputy county clerk with some election duties), *Millus v. D'Angelo*, 224 F.3d 137, 138 (2d Cir. 2000) (per curiam) (New York City election day operations coordinator), and *Soelter v. King County*, 931 F. Supp. 741, 744–45 (W.D. Wash. 1996) (Seattle elections manager working under county executive).

All of those cases involve a single administrator to whom a board or higher executive delegates considerable responsibility for running elections and carrying out the higher authority's policy decisions. By definition, of course, it is not possible for a single administrative position to represent multiple viewpoints (unlike the State Board).

The cases the Governor relies on address a fundamentally different situation than the one contested here. Plaintiffs are not disputing the authority of a majority of the State Board to hire an executive director who shares its policy views. Rather, plaintiffs contest whether 35 percent of

12

registered voters can be excluded from membership on the board based solely on their political affiliation. Both the Governor and legislative defendants espouse platitudes about the importance of political balance and instilling public confidence in the election process. Plaintiffs agree that those issues are highly relevant to the make-up of the board, but case law on a board's selection of an administrator add nothing to the discussion.

The purpose of the *Elrod-Branti* exception is to avoid a situation in which a governing official "must attempt to implement his policies and perform his duties through [board members] who have expressed clear opposition to him." *Jenkins v. Medford*, 119 F.3d 1156, 1165 (4th Cir. 1997). Removal of the ban would in no way require the Governor to appoint a majority of board members who have expressed clear opposition to him. And plaintiffs' success in this case would not impact the Governor's ability to wield policy-making control over the State Board. Political party affiliation is simply one measure of alignment of views—but it is not a perfect measure, or the only measure. Thus, even if the Court uses the political patronage cases as a framework to decide the First Amendment claims, the statute must be invalidated.

### 4. Dismissal at the pleading stages is inappropriate because defendants bear the burden of proof.

Furthermore, under either *Anderson-Burdick* or *Elrod-Branti*, the Governor bears the burden to show that party affiliation is an appropriate requirement for service on the State Board. *Anderson*, 460 U.S. at 789; *Bland v. Roberts*, 730 F.3d 368, 375 (4th Cir. 2013); *Peterson*, 777 F.3d at 342; *see also Knight v. Vernon*, 214 F.3d 544, 551 (4th Cir. 2000) (placing the burden to satisfy the *Elrod-Branti* exception on the government-defendant). At this stage, dismissal of claims for which the defendants bear the burden would be inappropriate.

### 5. The ballot-access cases provide a helpful analogy.

The exclusion of 35 percent of registered voters from the State Board stands in stark contrast to the benchmark courts have established in ballot access cases. While no bright line has been set, it is generally accepted that a third political party that wants on the ballot may be required to show up to five percent support, *Jenness v. Fortson*, 403 U.S. 431 (1971), but that 15 percent would be way too high, *Williams*, 393 U.S. 23. *See Libertarian Party of N.C. v. State*, 365 N.C. 41 (2011). And under some circumstances, even requiring signatures from two percent of registered voters can be too much. *Delaney*, 370 F.Supp.2d 373.

14

In other words, if unaffiliated voters were treated like a third party they would have passed the point of deserving recognition—and representation on the State Board—many years ago. *Williams*, rightly recognized that "the Ohio system [the 15 percent requirement] does not merely favor a 'two-party system'; it favors two particular parties—the Republicans and the Democrats—and in effect tends to give them a complete monopoly." 393 U.S. at 32. The same conclusion is obvious here: Shutting out the largest group of voters in the state—those who reject Democratic and Republican labels—is intended to prop up and entrench the two-party duopoly and not to instill public confidence.[3]

---

[3] It is difficult to imagine how public confidence is enhanced by turning all aspects of election administration over to Democratic and Republican partisans when only 41 percent of Americans have a favorable view of the Democratic Party and only 37 percent have a favorable view of the Republican Party. Pew Research Center, As Partisan Hostility Grows, Signs of Frustration With the Two-Party System,(Aug. 9, 2022). Distrust has grown significantly in the last quarter century. "In 2012, for the first time, the Democrats' unfavorability rating was higher than its favorability score." Howard J. Gold, Americans' Attitudes Toward the Political Parties and the Party System 5 (2015). "In 2013, only one-third of Americans said they had a favorable opinion of the Republican Party, and the percentage of those unfavorable exceeded those favorable by an overwhelming 25 points (58 – 33)." *Id.*

## CONCLUSION

Plaintiffs have articulated in two briefs how the wholesale exclusion of the largest group of registered voters from serving on the State Board states a claim and violates their rights. Simply because there is no case out there on all fours with this one does not justify the exclusion. The motion to dismiss should be denied.

Respectfully submitted, this 30th day of May, 2023.

By: /s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.
N.C. State Bar No. 4112
espeas@poynerspruill.com
Caroline P. Mackie
N.C. State Bar No. 41512
cmackie@poynerspruill.com
POYNER SPRUILL LLP
P.O. Box 1801
Raleigh, NC 27602-1801
Telephone: (919) 783-6400
Facsimile: (919) 783-1075

By: /s/ Michael Crowell
Michael Crowell
N.C. State Bar No. 1029
lawyercrowell@gmail.com
1011 Brace Lane
Chapel Hill, NC 27516
Telephone: (919) 812-1073

*Counsel for Plaintiffs*

**CERTIFICATE OF WORD COUNT COMPLIANCE**

The undersigned certifies that this brief meets the word-count limitation contained in L.R. 7.3(d) in that it contains 3,303 words, excluding the caption, signature lines, and certificate of service.

/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.

## CERTIFICATE OF SERVICE

I certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel and parties of record.

| | |
|---|---|
| D. Martin Warf<br>Phillip J. Strach<br>NELSON MULLINS RILEY &<br>SCARBOROUGH LLP<br>4140 Parklake Drive, Suite 200<br>Raleigh, NC  27612<br>martin.warf@nelsonmullins.com<br>phillip.strach@nelsonmullins.com<br><br>*Attorneys for Defendants Timothy K. Moore, Speaker, North Carolina House of Representatives and Philip E. Berger, President Pro Tempore, North Carolina Senate* | Matthew Tulchin<br>Amar Majmundar<br>N.C. DEPARTMENT OF JUSTICE<br>P.O. Box 629<br>Raleigh, NC  27602-0629<br><br>*Attorneys for Defendant Cooper* |

This the 30th day of May, 2023.

/s/ Edwin M. Speas, Jr.
Edwin M. Speas

18